Your Honor, Sandy Forbes for plaintiff appellant, Bernadine Ray. Your Honor, Jim Mackey for TUCSON OLD PUEBLO CREDIT UNION. Thank you, Your Honor. May it please the Court, Counsel, and those in the theater, in the auditorium, I would like to advise the Court, I'd like to reserve two minutes for rebuttal, assuming I can keep track of it. As you know, I represent Bernie Ray, formerly the CEO and President of TUCSON OLD PUEBLO CREDIT UNION. She filed an age discrimination case under the Arizona Civil Rights Act, as well as the Age Discrimination and Employment Act. In essence, she was terminated at the age of 68 in 2001 by the credit union after 40-something young Turks on the board, encouraged by state and federal examiners, and with the hubris of the young, orchestrated what basically was a coup to get rid of her. According to at least one of them, Tim Harrington, 40-something, young 40-something, Ray had outlived her usefulness and by implication was incapable or not competent because of her age to effectively deal with the credit union's financial situation. The Court below granted summary judgment. It looked first, of course, at whether my client had established a prima facie case, although it questioned whether she had on two of the elements. Obviously, under Wallace, a minimal showing is necessary for a prima facie case, and the Court went on to look at whether my client, after the credit union had established, articulated its non-discriminatory reason for the action, whether my client had proved pretext. And the nub here is that looking at the opinion of the district court, it's pretty clear that the court basically decided, citing Reeves, that my client had not been able to demonstrate that the reason given by the credit union for her termination was not credible and also had not established any evidence showing a discriminatory motive that is age bias. Basically, what the Court said was it looked at that other part of Reeves, which said, you know, if the record conclusively shows some other reason for the action taken, then pretext has not been established. And the judge said basically that the other reason was the financial condition and the year 2000 financial report that was produced by the state and federal credit union examiners.  I think the best evidence of pretext is some of the language that was used during the course of the meetings that the Board and Supervisory Committee had, especially in May of 2001, and then at the time my client was terminated in June of 2001. It's clear that the examiners were pressuring the credit union to get rid of my client, and there was a pressure early on, an inquiry by those examiners in 1998 about what my client's retirement plans were. Now, the pressure that was being exerted by the examiners evidently continued, and it appears that what the examiners did was pressure these young 40-somethings that went on the Board in 1999, 2000. Those were Tim Harrington and Russell Hughes, pressured them and said that they were interested in having the Board, basically interested in having the Board terminate my client. The fact that you terminated your client a few months earlier gave her a very high-quality evaluation and a bonus. That's right. So why shouldn't we apply the same actor inference? Well, the same actor inference should not be applied in this case because of the events that occurred in the interim, in this report for the year 2000 that happened in April of 2001. In addition, during that time, it's clear from the testimony that Tim Harrington was talking, and actually Russell Hughes as well, another young Board member, were talking to the examiners, and the examiners were making it clear to those individuals that they wanted to see my client gone. And the inference is that they wanted to see my client gone, and Hughes and Harrington wanted to see my client gone, because they did not believe my client was competent or able to bring about any improvement in the financial condition of the credit union. So how does that help your pretext? If I'm a member of a Board of a credit union and the examiners come in and say, in effect, she can't do the job, she has to go, why is that age discrimination? Well, there is other evidence beyond that. But see, here you've got to demonstrate that the reason cited by the credit union is pretext, and nothing sounds pretextual about that. Well, the reason that the credit union gave was that they lost confidence in my client. There are two other reasons that are articulated, but in truth, that first reason, that they lost confidence, subsumes the poor results in the 2000 examination, and also subsumes the idea that Ray could no longer manage the credit union in a competent manner. But in addition, what you have are comments in the meeting. If you look at the excerpts of record that contain the minutes or the actual transcript of the meeting at which my client was terminated, they were not talking about that, the financial condition, or the 2000 report. What they were talking about was this pattern of concern that was introduced by Tim Harris, and also by Mr. Hughes, and was apparently contributed to by Mr. Kendrow, another board member. And the decision that they made that day to terminate my client was not expressly based on the financial condition. It was based on the lies and innuendo and the untruths and mischaracterizations that were contained in that. It doesn't matter whether the board was right or wrong. It matters whether the board was truthful in believing it was terminating your client based on those reasons. And those reasons aren't age-related. But the comments that were made include, at the 2001 meeting, the June meeting, that management, Harrington said, management had to outlift its usefulness at the credit union. And he said, we're not dealing with a CEO who has served, dealing not simply with a CEO who has served beyond her time, but also with a CEO who has done wrong things in the past. And Kendrow said it was time to put on a new mantle and walk forward in a new way. And Kendrow also said they needed a new direction. And Hughes questioned Ray's competence. In light of all the other evidence, the inference is reasonable to draw that it was based in part, at least in part, on her age. And that is for the jury to decide. Now, there's one other issue, and I think you alluded to it in your question, which is the cat's paw issue. Apparently, based on the transcript of that meeting in June, there were two issues. There were members who believed what was said in the pattern of concern. But my client has shown that most of the things in the pattern of concern were absolutely untrue. So what you have here is two young board members who probably wanted somebody much younger than my client. And I think the inference... I think the cat's paw analysis is applicable, and that's why I think you can't apply the same actor inference, because there were those intervening events that brought up the bias of the individuals. Thank you very much. Thank you for your argument. Thank you. Let me first apologize for my voice. I've been inflicted lately. In 2001, Tucson-Oklahoma Credit Union brought home the worst report card in its history. It received a camel rating of 4, an overall camel rating of 4, and a camel rating of 4, which is almost the worst possible camel rating you can receive in management. And the NCUA and the ASDB, the governing bodies for the credit union, gave TopCoup the worst ratings it had ever received. It placed the credit union in the serious jeopardy of being taken over by the NCUA. The examiners criticized TopCoup in many, many ways, but virtually all of them related to management. Where is it in the record that they were in serious jeopardy of being taken over? Well, I think it's stated in the minutes of the... I think those views were expressed by board members, but I don't think that's not to be found in the report. Well, I think that in the minutes of the meeting and in the... Well, let me go back. I believe it is in the minutes of the discussions, but as far as the board was concerned, they believed that they were in serious jeopardy of being taken over. And if you look at the camel outline, which describes the rating system itself, it says that... Well, it's not a good report, but, you know, I've seen a few bad bank reports, and this one is not horrible by some measure. I mean, there were no loans that were outstanding. They said your risk analysis is bad, we have some risky loans, stop making construction loans, your documentation is bad, you've got... There were some technical difficulties, but the credit union wasn't in financial jeopardy at that point. It didn't seem to me reading the report. Well, Your Honor, I think it was in financial jeopardy. At that time, the return on assets was rapidly decreasing, the delinquencies were rapidly increasing. As of the end of May, the return on assets was so low that it was losing money at the rate of $3 million a year. Now, compared to its profit for the prior year, that's a substantial amount of money for a $156 million credit union. But this had been true for some time, leading me to the question of the favorable review given, Ms. Ray, even though the decline had occurred over a period of years and the management issues were not new. So how do you explain the good performance? Well, that's not necessarily true, because the large decreases in the return on assets and the increases in the delinquency rate were a function of the indirect lending program. And the indirect lending program was instituted in the middle of 2000, in approximately July of 2000. And that was a program that was approved by the board, but it was under the control of Ms. Ray, who was tasked with managing that program. And she understood that it was something that she had to stay on top of and it had to be viewed cautiously and take care of it. And she did it. She didn't institute any controls over it. She didn't monitor at all. She didn't track any of the loans. She didn't know where those loans were coming from. She instituted no controls over it at all. She had no idea where any of the loans were coming from until March of 2001. By that time, it was seriously out of control in her own words. Had she ever received a negative review? She had not. And that doesn't... And she had been at the credit union for how long? Approximately 25 years. And how long as CEO? At least 20. So 20 years of positive reviews and the last review is 9.5 on a scale of 10 and includes a $7,500 bonus, something like that? Yes, exactly, Your Honor. What happened? Did this happen overnight? It did. It happened overnight. What happened is that the examiners came in and the outside auditors came in at about the same time and they said things are going south here fast. And a lot of it had to do with the indirect living program of which she was instituting no controls at all. The trends were going down. The year before, they had virtually no income because she said because of the Y2K program and they had planned losses, but essentially they had no profit. The year before in which they had virtually no income, did she receive a positive review? She did. And a bonus. And see, in fact, that's one of the things that the examiners criticized the board about is that they were giving her bonuses when she really wasn't performing. And so ultimately what the board did here is they said, we're seeing all of this criticism because of management and ultimately this credit union is going under. And so what happens when management is not performing? Well, the board can't fire itself. They're volunteers. The highest paid executive in this organization was Bernie Ray. She was responsible for the day-to-day management of this credit union. She was responsible for expenses, profitability, for managing the risk, for all of the day-to-day aspects of the credit union. Everyone except her worked for her. She was the only employee of the board. And so what this board did was exactly what I think any other board in the country would do is they terminated her to start over. I think that was very reasonable. Could a finder of fact, could a jury infer from comments such as she's outlived her usefulness that maybe they terminated her and if she'd been 50 and had expectations of an active career yet as opposed to somebody who's 68 and approaching retirement at some point, is that age discrimination if they treat a 68-year-old differently than they treat somebody younger? Well, I don't think they can, Your Honor. I think the reality here is that this is a CEO that had been working there for some time. And outliving her usefulness is essentially saying that they had done things that they had produced for a certain time but their production had slowed and that the scale had started to tip downward and that she was no longer producing. She was no longer a useful asset to the credit union. There's nothing in the record anywhere that suggests that there's any implication of her age. Three of the board members here were substantially older than she was and one was the same age. There's nothing in this record to suggest that there was any indication of an age discrimination in this decision. And if I may, Ms. Forbes spoke of Mr. Harrington and a coup to get rid of her in this pattern of concern. I want to be sure that I address that the way that last board meeting occurred and first in May of the second board meeting, the closed board meeting that they had without her, the second one, they talked about terminating her in that meeting and basically what they said was she's too young. We can't keep her around because we'd like to keep her until she retires. But we can't keep her that long because if we kept her, we could potentially lose control of the credit union. And so they said we have to terminate her. And so then they went to a vote in June of 2001 and they brought to that meeting a ballot form. And at that meeting they passed around a stick and everybody got to talk. And before they even got to any discussion of the pattern of concern memo, five of the seven members had made a determination that they were going to vote for her without any discussion of the pattern of concern memo. And so if you look at Hughes, Harrington, Sager, Gerhardt, and it's in the record, Gerhardt said, nothing you say here today is going to change my opinion. I decided when I was at that meeting with the examiners that Bernie Ray had to go. Harrington, Hughes, Gerhardt, Sager, and Kendrell all said before any discussion of the pattern of concern memo that Bernie Ray had to go. So the pattern of concern memo had nothing to do with the decision to terminate her. And with respect to the discussion at the board meeting before they voted, if you take the quantity of discussion, most of it was devoted to the concern memo, the pattern of concern memo, right? I mean, you can't just blow it off. No, no, that's correct, Your Honor. But I'm saying they indicated before that discussion that they would vote to have her termination because it was a discussion on what they thought. And they indicated, it's in the record, that they would vote to terminate her before that discussion. So there would be five votes right there, and they only needed four. Well, isn't this a mixed motive case? Well, I don't think there's any, I don't think it's a mixed motive case, Your Honor, because I don't think that there's any evidence of age discrimination at all. So if there was, then perhaps it would be, but I don't think there's any suggestion of age discrimination here. I don't think that there's, I mean, and then, I mean, I don't think there's substantial, specific or substantial evidence of age discrimination to get over her hump at all. And then if you apply the same actor inference, which I definitely think does apply here because I think the, I believe it's the Coughlin case, yeah, Coughlin case cited in my supplemental brief, definitely applies and suggests that in this instance where the board has year after year shown that age was not a factor, six months before this decision they showed that the age was not a factor, this report comes in, you know, basically everything starts to happen, and they make this decision to terminate her. It had nothing to do with her age. You're out of time. Thank you for your argument, counsel. We'll hear rebuttal at this time. Yes, I think I have a minute 33, maybe. I'll try to get it. Go ahead. Let me start with the issue of the CAMEL rating. The CAMEL rating is a subjective rating, and I just want to clarify, it was a four, even though if you average the composite, it would have been a three, which was exactly what the credit union had been the year before. So it was the examiners who exercised their subjective judgment and made it into a four. The issue of whether the board or the management could have lost control of the credit union, that was one of the threats that Mr. Harrington said could happen, that under FOREA the credit union could be taken over. Well, Mr. Harrington has acknowledged, he did it in a public meeting in front of my client and other people subsequent to these events, he acknowledged that they make that threat, but they never, the examiners make that threat, but they have yet to do it, and that he didn't, well, presumably he didn't think that would really happen. The question of whether there was reliance on the part of the board on the pattern of concern is answered by the depositions of the individuals. Five out of the six board members who voted for termination either said they relied on it or had input, and by input I'm talking about Mr. Kendrow, had input into it, and so you could infer that he relied on it as well. I'm sorry, five out of the six. The sixth one saw the inevitable was going to take place, and that's the only reason that he voted for termination. He said it was a foregone conclusion, even though he was not satisfied. You asked? You need to wind up. You need to wind up. I will. As far as the mixed motive issue, I don't, there isn't any Ninth Circuit case that I could find that applied the mixed motive analysis to the DEA, and so I think we have to rely on pretext, and in this case there is sufficient evidence of pretext presented in this record giving all the inferences, legitimate inferences in favor of Bernie Ray that we are entitled, she is entitled to a trial by jury. Thank you very much. Okay. Thank both sides for their arguments. The case just argued will be submitted for decision.
judges: Hawkins, Thomas, Clifton